**Daryl A. MILLER, Plaintiff–Appellant,**

v.

**AT & T NETWORK SYSTEMS, an AT & T Technologies, Inc. Group, Defendants–Appellees.**

No. 86–4074.

United States Court of Appeals, Ninth Circuit.

Argued and Submitted March 7, 1988.

Decided June 24, 1988.

As Amended on Denial of Rehearing and Rehearing En Banc Aug. 24, 1988.

James M. Brown, Enfield, Guimond & Brown, Salem, Or., and Michael J. Tedesco, Tedesco & Wilson, Portland, Or., for plaintiff-appellant.

Richard N. Van Cleave, Michael J. Brown, and Raymond A. Ledogar, Spears, Lubersky, Campbell, Bledsoe, Anderson & Young, Portland, Or., for defendants-appellees.

Before GOODWIN, NELSON and LEAVY, Circuit Judges.

## ORDER

The opinion filed June 7, 1988 is hereby VACATED.

## OPINION

NELSON, Circuit Judge:

Daryl Miller worked as an installer for AT & T for more than twenty years. His working conditions were governed by a collective bargaining agreement (CBA), which included provisions concerning work assignments, transfers, and discharges. It also contained an exclusive grievance procedure that included binding arbitration.

Because heat affects Miller's heart rate, sometimes causing him to faint at temperatures above ninety degrees, AT & T had always assigned him to work in cool climates. In May 1985, however, AT & T assigned Miller to work for thirteen weeks in Mesa, Arizona, where temperatures often exceed ninety degrees. As a result, Miller lost consciousness while working. When Miller refused to return to Mesa, AT & T fired him. Miller was willing to continue working elsewhere if temperatures were lower.

Miller sued AT & T in Oregon state court, alleging discrimination based on physical handicap, in violation of Oregon Revised Statutes sections 659.121, 659.405, and 659.425. He also alleged intentional infliction of emotional distress. AT & T removed the action to federal court based both on diversity and on the existence of a federal question under section 301 of the Labor Management Relations Act (LMRA). AT & T obtained summary judgment by arguing that federal labor laws preempted Miller's state-law claims. We reverse dismissal of the discrimination claim because it is based on a nonnegotiable, independent state right. We affirm the grant of summary judgment on the claim of intentional infliction of emotional distress.

## STANDARD OF REVIEW

The district court's grant of summary judgment is reviewable de novo. *Scott v. Machinists Automotive Trades Dist.* *Lodge No. 190*, 827 F.2d 589, 591 (9th Cir. 1987).

## DISCUSSION

*I. Section 301 Preemption of the Discrimination Claims*

█ Section 301 of the LMRA, 29 U.S.C. § 185(a), creates a federal cause of action for breach of collective bargaining agreements. Federal laws govern suits brought for breach of a collective bargaining agreement, even if brought in state court. *Textile Workers Union v. Lincoln Mills*, 353 U.S. 448, 456, 77 S.Ct. 912, 917, 1 L.Ed.2d 972 (1957). Applying federal law to these cases ensures a uniform interpretation of labor contract terms, a goal that the Supreme Court has described as particularly compelling. "The possibility that individual contract terms might have different meanings under state and federal law would inevitably exert a disruptive influence." *Local 174, Teamsters Union v. Lucas Flour Co.*, 369 U.S. 95, 103, 82 S.Ct. 571, 577, 7 L.Ed.2d 593 (1962). In order to preserve this uniformity, even suits based on torts, rather than on breach of collective bargaining agreements, are governed by federal law if their evaluation is "inextricably intertwined with consideration of the terms of [a] labor contract." *Allis–Chalmers Corp. v. Lueck*, 471 U.S. 202, 213, 105 S.Ct. 1904, 1912, 85 L.Ed.2d 206 (1985). Section 301 preempts all state-law causes of action evaluation of which requires interpretation of a labor contract's terms. *See, e.g., Allis–Chalmers*, 471 U.S. at 214–20, 105 S.Ct. at 1912–15 (finding preempted a state tort based on the duty to act in good faith and deal fairly, because the meanings of "good faith" and "fair dealing" were derived from the particular labor contract); *Lucas Flour*, 369 U.S. at 104, 82 S.Ct. at 577 (finding preempted a state breach-of-contract suit based on the collective bargaining agreement).

█ Although its scope is substantial, section 301 does not preempt every suit concerning employment. If a court can uphold state rights without interpreting the terms of a CBA, allowing suit based on the state rights does not undermine the pur-

pose of section 301 preemption: guaranteeing uniform interpretation of terms in collective bargaining agreements. Therefore, "nonnegotiable state-law rights ... independent of any right established by contract" are not preempted. *Allis–Chalmers*, 471 U.S. at 213, 105 S.Ct. at 1912. A contrary rule would permit unions and employers to exempt themselves from state labor standards. Congress never intended "to preempt state rules that proscribe conduct, or establish rights and obligations, independent of a labor contract." *Id.* at 212, 105 S.Ct. at 1912; *see, e.g., Paige v. Henry J. Kaiser Co.*, 826 F.2d 857, 863 (9th Cir.1987) (holding that a wrongful discharge claim based on violation of a state public policy is not preempted, because it is a nonnegotiable independent state-law right), *cert. denied,* June 13, 1988.

In this case, plaintiff seeks to pursue state-law claims that he contends rest on independent, nonnegotiable state-law rights. Defendants argue that these are rights evaluation of which is inextricably intertwined with the terms of a labor contract. This dispute requires interpretation of the discussion of "nonnegotiable, independent state-law right" in *Allis–Chalmers.* The concept "nonnegotiable" is clear. A right is nonnegotiable if the state law does not permit it to be waived, alienated, or altered by private agreement.

The concept "independent of any right established by the contract," however, causes some difficulty. In particular, the parties disagree about the significance of overlap between the particular labor contract and the state law. Defendants contend that the state statute is preempted because the CBA contains provisions that offer relief similar to that available in the state court. We disagree. Both Supreme Court precedent and the policies underlying section 301 preemption directly rebut this position.

### A. The Meaning of "Independent State-Law Rights"

The Supreme Court's definition of "independent rights" makes clear that we cannot accept defendants' claim that parallel protection in collective bargaining agreements mandates preemption. Independent rights are those state-law rights that can be enforced without any need to rely on the particular terms, explicit or implied, contained in the labor agreement. In *Caterpillar, Inc. v. Williams*, —— U.S. ——, 107 S.Ct. 2425, 2431, 96 L.Ed.2d 318 (1987), the Supreme Court found not preempted a suit for breach of an individual employment contract established independently of plaintiffs' collective bargaining agreement. The Court found the state-law contract rights independent even though the collective bargaining agreement provided similar substantial rights on the basis of which plaintiffs might have sued. Mere similarity between state-law protections and contractual provisions did not require preemption. *See also Paige*, 826 F.2d at 863 (stating that mere incorporation of state-law torts into a collective bargaining agreement does not preempt the state-law tort under section 301).

Rather, preemption in the Supreme Court requires that the dispute could be resolved under the CBA, *and* that the state law did not establish a criterion for deciding the case that permits application of state law without reference to the terms of the CBA. In *Allis–Chalmers*, the Court noted that Wisconsin's tort of bad-faith dealing on disability claims overlapped with an implied duty of good-faith in the collective bargaining agreement. 471 U.S. at 216, 105 S.Ct. at 1913. However, the Court did not find the tort preempted based on this overlap. Rather, the Court explained that Wisconsin law did not articulate a mandatory, independent standard of bad faith. Because Wisconsin did not intend to prevent private parties from establishing contractual definitions for reasonable performance of this duty, it permitted contractual modification of the state-tort standard. Therefore, a court could not grant plaintiff relief unless the defendant's behavior fell below both the state standard and any contractual modification to that standard set out in the CBA. Such a finding, of course, would require interpretation of the terms of the CBA. This analysis provides a clear indication that mere similarity between a state

law and the terms of a collective bargaining agreement will not preempt the state law. *See also Franchise Tax Bd. v. Construction Laborers Vacation Trust,* 463 U.S. 1, 25 n. 28, 103 S.Ct. 2841, 2854 n. 28, 77 L.Ed.2d 420 (1983) (stating that "a state battery suit growing out of a violent strike would not [be preempted by] section 301 simply because the strike may have been a violation of an employer-union contract").

The Supreme Court's interpretation of "independent rights" better serves the policy underlying section 301 preemption than would preempting every statute that offers similar protections to a collective bargaining agreement. Section 301 requires uniform interpretation of the terms of labor contracts because permitting multiple meanings for particular contract terms would disrupt collective bargaining. *See Lucas Flour,* 369 U.S. at 103, 82 S.Ct. at 576. The danger of varied interpretation of contract terms arises even if the state claim alleges a tort, rather than a breach of contract. *See Allis–Chalmers,* 471 U.S. at 211, 105 S.Ct. at 1911.

However, the policy supporting uniform interpretation of contract terms does not prohibit states from establishing different labor regulations. The Court has been careful to distinguish between state laws that require interpretation of labor contract terms, and state laws that preclude parties from imposing a particular term in their contract. Section 301 does not preempt state laws that alter the "substance of what private parties may agree to in a labor contract." *Id.; see also Metropolitan Life Ins. Co. v. Massachusetts,* 471 U.S. 724, 753–58, 105 S.Ct. 2380, 2396–98, 85 L.Ed.2d 728 (1985) (finding that state minimum labor standards do not interfere with the collective bargaining process and are therefore not preempted under the doctrine of *Machinists v. Wisconsin Employment Relations Comm'n,* 427 U.S. 132, 96 S.Ct. 2548, 49 L.Ed.2d 396 (1976)). Because section 301 "does not grant the parties to a collective-bargaining agreement the ability to bargain for what is illegal under state law," *Allis–Chalmers,* 471 U.S. at 212, 105 S.Ct. at 1912, only "state-law rights and obligations that do not exist independently of private agreements, and that as a result can be waived or altered by agreement of private parties, are preempted." *Id.* at 213, 105 S.Ct. at 1912.

Finding preemption whenever CBAs offer protections similar to those provided by state law is inappropriate because it fails to distinguish between state laws that require interpretation of the terms in a CBA, and state laws that disallow all agreements to particular terms.[1] The mere fact that a CBA contains terms that could govern the same situations that a state law governs does not necessarily mean that the state law requires interpretation of the terms in the CBA. The state law might impose mandatory requirements to which all employment contracts in the state must adhere. If mere overlap were permitted to preempt state law, section 301 would begin to dictate the "substance of what private parties may agree to in a labor contract." *Id.* at 211, 105 S.Ct at 1911. This approach to section 301 preemption undermines the principle that section 301 should not "delegate to unions and unionized employers the power to exempt themselves from whatever state labor standards they disfavor[ ]," *id.* at 212, 105 S.Ct. at 1911–12, because under this approach, an employer can become exempt from any state labor standard merely by including terms in its labor agreement that appear to govern similar situations.

The Supreme Court approaches independence of state-law rights by considering whether the state law was intended by the state to rely on the terms of the collective

---

1. Nonetheless, some courts have adopted this approach to section 301 preemption. For example, in *Fleming v. Chrysler Corp.,* 659 F.Supp. 392, 393 (E.D.Mich.1987), a district court found the Michigan Handicappers' Civil Rights Act preempted because the claim "ar[ose] out of subject matter included in the CBA." The court did not inquire whether, despite this overlap, the statute defined independent rights and obligations without reference to similar rights defined in the contract. The court assumed that overlap between state-tort protections and contractual protections automatically makes consideration of the state right inextricably intertwined with the terms of the labor agreement. *Id.*

bargaining agreement, and whether the state intended to impose terms that the collective bargaining agreement could not alter. The policy underlying section 301 preemption supports this method of deciding preemption questions. We therefore prefer this approach to inquiring whether the collective bargaining agreement contains rights similar to those created by state law.

■ In deciding whether a state law is preempted under section 301, therefore, a court must consider: (1) whether the CBA contains provisions that govern the actions giving rise to a state claim,[2] and if so, (2) whether the state has articulated a standard sufficiently clear that the state claim can be evaluated without considering the overlapping provisions of the CBA, and (3) whether the state has shown an intent not to allow its prohibition to be altered or removed by private contract. A state law will be preempted only if the answer to the first question is "yes," and the answer to either the second or third is "no."

### B. Oregon's Civil–Rights Law Protecting the Physically Handicapped

■ Oregon Revised Statutes § 659.425 makes unlawful firing an employee because of a physical impairment if, with a reasonable accommodation by the employer, the individual could perform the work involved. Appellees argue that the statute is inextricably intertwined with consideration of terms in the labor contract. In order to evaluate the discrimination, they say, a court must consider whether AT & T acted reasonably under Article 13 of the CBA, which governs local assignments and transfers, and whether AT & T had just cause to fire appellant under Article 22 of the CBA, which governs termination of employment. We have found no circuit cases directly addressing this issue.[3]

Appellees' argument that evaluation of the state antidiscrimination claim requires interpretation of the CBA, and therefore that the claim is not independent does not persuade us. A claim challenging a discharge need not be preempted merely because certain aspects of the collective bargaining agreement govern work assignments and discharges.

Appellees cite four Ninth Circuit cases to support their argument that Miller's discrimination claim is dependent on terms in the CBA. First, they argue that appellant's claim is like that presented in *Truex v. Garrett Freightlines, Inc.*, 784 F.2d 1347 (9th Cir.1985). In *Truex*, the court found an emotional distress claim preempted because it was based on the employer's issuance of unjustified warning letters and on excessive supervision of the employee. The court reasoned that because the propriety of warning letters and of supervision requires a standard of appropriate behav-

2. A court need not consider whether a state has articulated a standard of behavior not subject to contractual alteration if the particular collective bargaining agreement contains no provisions, explicit or implied, covering the behavior said to violate a state tort. If a CBA contains no relevant terms that might be interpreted, then no danger of inconsistent interpretation arises. *See, e.g., Tellez v. Pacific Gas and Elec. Co. Inc.*, 817 F.2d 536, 539 (9th Cir.), *cert. denied,* — U.S. —, 108 S.Ct. 251, 98 L.Ed.2d 209 (1987). *Cf. Allis Chalmers,* 471 U.S. at 215, 105 S.Ct. at 1913 (warning that both explicit and implied terms of a CBA must be considered in making section 301 preemption decisions).

3. Several district court cases have considered whether section 301 preempts state antidiscrimination laws when former employees challenge demotions and dismissals as discriminatory. Most of them have found no preemption. *See Gavie v. Stroh Brewing Co.*, 668 F.Supp. 608

(E.D.Mich.1987) (finding state age discrimination statutes not preempted); *Trombley v. Ford Motor Co.,* 666 F.Supp. 972 (E.D.Mich.1987) (finding Michigan's Handicappers' Civil Rights Act not preempted); *Nolte v. Blue Cross Blue Shield of Michigan,* 651 F. Supp. 576 (E.D.Mich. 1986) (same); *Turk v. General Motors Corp.,* 637 F.Supp. 739 (E.D.Mich.1986) (same); *Elstner v. Southwestern Bell Tel. Co.,* 659 F.Supp. 1328 (S.Dist.Tex.1987) (finding Texas Human Rights Act prohibition on discrimination based on physical handicap not preempted). However, a few district courts have held to the contrary. *See, e.g., Fleming v. Chrysler Corp,* 659 F.Supp. 392 (E.D.Mich.1987) (finding Michigan Handicappers' Civil Rights Act preempted). The district courts that find preemption seem to rely on an understanding of "independent" that precludes independence if the CBA overlaps with state law. *See Gavie,* 668 F.Supp at 611 n. 4 (criticizing cases finding preemption on this ground).

ior, the cause of action will inevitably construe standards set forth in the CBA. *Id.* at 1349–50.

*Truex* is not relevant to this case. Claims for intentional infliction for emotional distress require courts to evaluate the reasonableness of behavior creating the emotional distress. *See, e.g., Alcorn v. Anbro Eng'g Inc.*, 2 Cal.3d 493, 86 Cal. Rptr. 88, 468 P.2d 216, 218 (1970). When a court is called upon to decide whether an employer acted reasonably, the possibility that the CBA permitted the employer's behavior would strongly support the claim of reasonableness, unless the state had imposed some specific standard disallowing agreements that permit such behavior. Nothing in *Truex* suggests that the state had attempted to regulate when employers could issue warning letters or supervise their employees. Therefore, evaluating the emotional distress claim in *Truex* would almost certainly have required an inquiry into whether the behavior alleged to have caused emotional distress was prohibited by the terms of the CBA.

This case does not require similar consideration of the terms of the CBA. Oregon has construed its discrimination statute so that it relies on standards of discriminatory firings that are independent of any standard of reasonable treatment set forth in the CBA. The Oregon Supreme Court stated that "[t]he question whether the employer acted in good faith or on reasonable grounds ... does not control the employee's employment rights under the statute." *Montgomery Ward & Co., Inc. v. Bureau of Labor*, 280 Or. 163, 570 P.2d 76, 79 (1977). Instead, a discrimination claim relies on a statutory standard:

> the legislature intended by the statutory language to impose upon an employer the obligation not to reject a prospective employee because of a physical or mental handicap unless there is, because of the defect, a probability either that the employee cannot do the job in a satisfactory manner or that he can do so only at the risk of incapacitating himself.

*Id.* The question whether the employee can satisfactorily perform the job does not depend on interpretation of standards set out in the CBA governing job assignments and discharge. Rather, Oregon courts look to independent expert opinions of what skills a particular job requires without regard to minimum standards set out by the employer. *See Brown v. City of Portland*, 80 Or.App. 464, 722 P.2d 1282, 1286 (1986).

Appellees also rely on *Olguin v. Inspiration Consol. Copper Co.*, 740 F.2d 1468 (9th Cir.1984), in which the court found preempted state claims for breach of contract, wrongful discharge, wrongful discharge in violation of public policy, and intentional infliction of emotional distress. This case is not relevant for two reasons. First, none of the preempted claims in *Olguin* was based on a state tort that relied on a standard articulated by the courts without reference to a collective bargaining agreement. Second, the case was decided before *Allis–Chalmers*, and therefore did not apply the "inextricably intertwined" test. It is no longer binding precedent. *See Vincent v. Trend Western Technical Corp.*, 828 F.2d 563, 565–56 (9th Cir.1987). For the same reasons, appellee's reliance on *Magnuson v. Burlington Northern, Inc.*, 576 F.2d 1367 (9th Cir.), *cert. denied*, 439 U.S. 930, 99 S.Ct. 318, 58 L.Ed.2d 323 (1978), is not appropriate.

Appellees finally rely on *Bale v. General Telephone Co.*, 795 F.2d 775 (9th Cir.1986). In *Bale*, we found state-law fraud and misrepresentation actions preempted because, to prove fraud, the plaintiffs would have needed "to show that the terms of the collective bargaining agreement differed significantly from the individual employment contracts they believed they had made." *Id.* at 780. We concluded that the state-law claims were inextricably intertwined with the terms of the labor contract.

This state tort does not require a comparison of the discharge provisions of the CBA with the requirements of the statute. It requires only a showing that there is no probability that Miller cannot do the job satisfactorily or that he can do so only at the risk of incapacitating himself. *See Montgomery Ward*, 570 P.2d at 79. We therefore conclude that Oregon's antidis-

crimination statute articulates an independent standard that is not inextricably intertwined with the interpretation of terms in the CBA.

We also find that Oregon's antidiscrimination right is nonnegotiable. The statute is based on a declared policy of guaranteeing to all "handicapped persons the fullest possible participation in ... remunerative employment ... without discrimination." O.R.S. § 659.405(1). Oregon has decided that "employment without discrimination because of handicap ... [is] declared to be the right[ ] of all people in this state." O.R.S. § 659.405(2). Irrespective of any agreement to the contrary, employers may not fire employees because of a physical handicap unless the employee cannot do the job, or doing the job will harm the employee.

Because Oregon has declared discrimination based on physical handicap an unlawful employment practice, and guaranteed to all its citizens the right to employment opportunities free from such discrimination, we find that the rights and duties Oregon has established are mandatory.[4] Oregon's antidiscrimination statute thus creates a mandatory and independent state right that is not preempted by section 301.

## II. Preemption of Claim for Intentional Infliction of Emotional Distress

■ Miller's complaint alleges that AT & T's extreme and outrageous conduct caused Miller emotional distress. Appellees argue that this claim should be preempted under section 301.

Preemption of intentional infliction of emotional distress claims should be analyzed by asking the same three questions relevant to any other section 301 preemption issue. Preemption analysis becomes more complicated, however, when evaluating intentional infliction of emotional distress claims. Complications arise because most state torts allowing recovery for intentional infliction of emotional distress require the plaintiff to show that the defendant's conduct was outrageous, extremely unreasonable, or in some way inappropriate. *See, e.g., Kofoid v. Woodard Hotels, Inc.*, 78 Or.App. 283, 716 P.2d 771 (1986). Because the tort requires inquiry into the appropriateness of the defendant's behavior, the terms of the CBA can become relevant in evaluating whether the defendant's behavior was reasonable. Actions that the collective bargaining agreement permits might be deemed reasonable in virtue of the fact that the CBA permits them. Furthermore, even if the state's tort law is so developed that state courts determine what constitutes an outrageous act without considering the terms of a CBA, often little evidence will be available concerning whether the state tort was intended to preclude contractual agreements to permit acts that would otherwise give rise to an emotional distress claim. Therefore, in emotional distress cases, both independence and mandatoriness will be difficult to find.[5]

---

4. This case does not resemble *Allis–Chalmers*, in which the Court held that Wisconsin's tort of bad-faith handling of an insurance claim was preempted because Wisconsin's law defined good faith in terms of obligations contained in the CBA. The Court noted that "under Wisconsin law there is nothing that suggests that it is not within the power of the parties to determine what would constitute 'reasonable' performance of their obligations under an insurance contract." 471 U.S. at 216, 105 S.Ct at 1913.

5. These complications do not lead to preemption of all intentional infliction of emotional distress claims. Such claims may not be preempted if the particular offending behavior has been explicitly prohibited by mandatory statute or judicial decree, and the state holds violation of that rule in all circumstances suffi-

ciently outrageous to support an emotional distress claim. For example, if a plaintiff alleges that an employer's criminal behavior inflicted extreme emotional distress, the emotional distress claim need not be preempted. The behavior could be found sufficiently outrageous to permit recovery without regard to whether the behavior might be permitted under the CBA. Its outrageousness would be clear from the state's decision to make the behavior criminal. Furthermore, the state criminal statute might make clear that the act is not permitted despite any agreement to the contrary. The state has therefore made the standard of behavior both independent of the CBA and mandatory. Additionally, if the particular CBA does not govern the offending behavior, as in *Tellez*, then an emotional distress claim is not preempted.

In this case, we find the claim for intentional infliction of emotional distress preempted. Looking to Oregon tort law, we find that in this case evaluation of the intentional infliction of emotional distress requires construction of terms in the CBA. In order to establish intentional infliction of emotional distress in Oregon, a plaintiff must demonstrate that an employer's conduct extended "beyond the farthest reaches of socially tolerable behavior." *Kofoid*, 716 P.2d. at 775.

The "farthest reaches of socially tolerable behavior" is not an independent, nonnegotiable standard of behavior. Under Oregon law, the reach of socially tolerable behavior depends on the relationship between plaintiff and defendant. For example, behavior that would not be outrageous between unrelated individuals might be outrageous between an employer and an employee in some circumstances. *See Hall v. May Dep't Stores*, 292 Or. 131, 637 P.2d 126, 129 (1981). The outrageousness of Miller's reassignment and dismissal could depend on whether the behavior violated the terms of the CBA. Additionally, we cannot assume that the employer's behavior was outrageous for purposes of an emotional distress claim just because the employer may have violated a statutory prohibition against discrimination. Oregon courts have held that Oregon's antidiscrimination law may be violated even though an employer acts reasonably and in good faith. *See Montgomery Ward*, 570 P.2d at 79. They have also denied damages for intentional infliction of emotional distress even though they found the handicap discrimination law violated. *See Montgomery Ward & Co. v. Bureau of Labor*, 42 Or.App. 159, 600 P.2d 452 (1979) (on remand from *Montgomery Ward*, 280 Or. 163, 570 P.2d 76 (1977)). Therefore, we cannot assume that behavior violating the antidiscrimination statute is automatically outrageous for purposes of an emotional distress claim. Because the emotional distress claim requires consideration of reasonableness of AT & T's behavior, which in turn could depend on whether that behavior violated the collective bargaining agreement, the claim is preempted.

### CONCLUSION

Because Oregon's handicap discrimination statute imposes a mandatory and independent duty on employers that does not require interpretation of the terms of a CBA, section 301 does not preempt claims brought under this statute. The intentional infliction of emotional distress claim is preempted because Oregon law requires a showing that the employer violated a standard that requires consideration of the terms of the CBA. We therefore REVERSE in part and AFFIRM in part.[6]

---

6. At the same time this opinion was completed, the Supreme Court decided *Lingle v. Norge*, ___ U.S. ___, 108 S.Ct. 1877, 100 L.Ed.2d 410 (1988). That opinion confirms the approach we have taken in this opinion by stating that "even if dispute resolution pursuant to a collective-bargaining agreement, on the one hand, and state law, on the other, would require addressing precisely the same set of facts, as long as the state-law claim can be resolved without interpreting the agreement itself, the claim is "independent" of the agreement for § 301 pre-emption purposes."

The *Norge* opinion reaffirms the holding of *Allis-Chalmers* that all independent, non-negotiable state-law rights are not preempted by section 301. It notes that perhaps some independent, negotiable rights might also not be preempted. *Id.* at ___ n.9, 108 S.Ct. at 1883 n.9. Because this case concerns a non-negotiable right, nothing in it resolves the issue left open by the Supreme Court concerning independent negotiable rights.